IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DENA R. JAMES,

                Plaintiff,                CV-08-6120-ST

      v.                                        FINDINGS AND
                                                        RECOMMENDATION
MICHAEL J. ASTRUE, Commissioner, Social
Security Administration,

                Defendant.

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, Dena R. James ("James"), seeks judicial review of the Social Security Commissioner's final decision denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("SSA"). This court has jurisdiction under 42 USC § 404(g) and § 1383(c)(3). The Commissioner has filed a motion to reverse his prior decision and remand for further proceedings (docket #16). For the reasons that follow, the

1 - FINDING AND RECOMMENDATION

Commissioner's motion should be denied. Instead, his prior decision should be reversed, and this case should be remanded for the immediate calculation and award of benefits.

## ADMINISTRATIVE HISTORY

James protectively filed an application for SSI on April 11, 2005, alleging disability since August 2004. Tr. 54-55. Her application was denied initially and upon reconsideration. Tr. 28-37. James requested a hearing before an Administrative Law Judge ("ALJ"), who issued an unfavorable decision on May 16, 2007. Tr. 41, 15-25. James then requested review of the decision with additional evidence, which the Appeals Council denied on February 26, 2008. Tr. 4-10. Therefore, the ALJ's decision is the Commissioner's final decision subject to judicial review. 20 CFR §§ 416.981, 422.210; *Lewis v. Astrue*, 498 F3d 909, 911 (9th Cir 2007).

## BACKGROUND

James was born in 1971, has a high school education, and worked in the past as a grocery clerk, dietary aide/cook, and housekeeper in a hotel setting. Tr. 54, 64-65, 68. James claims to suffer from arthritis following surgery for a fractured ankle and headaches.

On August 9, 2004, James suffered a left ankle fracture dislocation. Tr. 119. The following day, Rick Stanley, M.D., performed an open reduction internal fixation. Tr. 111-12. This surgery included attaching a five-hole plate over the fractured bone, held in alignment by four screws. Tr. 111. Several times in August, Dr. Stanley noted that James was healing well, but a screw had come lose from the plate in her leg. Tr. 122. On October 5, Dr. Stanley noted that x-rays of her ankle showed loss of alignment with subluxation (dislocation) of the talus and more backing out of the screws. *Id.* He advised that she increase her weight bearing and remove her walking boot to perform range of motion exercises. *Id.*

On September 10, 2004, James called Dr. Stanley because she was in pain and feared that the wound from the surgery might be infected. Tr. 144. As Dr. Stanley was unavailable, he recommended that James go to the emergency room. Tr. 144. The emergency room nurse found drainage and diffuse swelling around the wound and prescribed Vicodin. *Id.*

On October 8, 2004, James returned to internal medicine specialist Steven Athay, M.D., her primary care physician, for chronic headaches, hypertension, and ankle pain. Tr. 178. He observed that the wound was healing and that Dr. Stanley would have to remove the protruding screw. *Id.* On October 20, 2004, Dr. Stanley stated that James was not making much progress and the screw was definitely loose. Tr. 121. He decided to take an x-ray before making a final decision to remove the screw. *Id.* By November 5, James had healed enough to remove the hardware from her leg. *Id.*

On November 23, 2004, orthopedic surgeon Leon Malkin, M.D., observed that James had painful, limited range of motion in her ankle. Tr. 154. James reported fairly continuous discomfort. *Id.* An x-ray showed the plate in the fibula and the one partially threaded screw. *Id.* He wrote in his report that James was going to have difficulty regaining a full range of motion with the loose screw and was likely to have symptomatic post-traumatic arthritis. Tr. 155. He recommended that she keep using a walker for the next few months, at which time surgery could be considered. *Id.*

On December 7, 2004, Dr. Stanley removed the plate and screws from the lateral malleolus and removed the screw with a small bone fragment. Tr. 121. X-rays taken in January 2005 revealed some loose fragments and collapse of the posterior malleolus. Tr. 120. Dr. Stanley gave her an ankle brace and recommended that she try to ambulate more. *Id.*

On April 27, 2005, Dr. Malkin observed that James had limited motion in her ankle and walked with a "markedly antalgic gait," meaning that she walked with her foot rotated out so as to avoid pain in her ankle. Tr. 153. He recommended that James consider ankle arthrodesis (a operation to stiffen the joint) if she did not have pain relief within about three months of using the brace prescribed by Dr. Stanley. *Id.*

On May 11, 2005, Dr. Athay prescribed James a cane as she walked with a limp and had to wear a permanent brace. Tr. 174.

On June 5, 2005, James sought emergency treatment for a twisted ankle. Tr. 124. Bruce R. Bohman, M.D., observed that her lateral malleolus was healed, but she had arthritis with joint space narrowing, either with degenerative changes or possible nonunion of the distal medial malleolus. *Id.* He concluded that she "obviously has degenerative arthritis." *Id.* He prescribed Vicodin and recommended that James continue using the splint. *Id.*

On November 16, 2005, Dr. Athay completed a form for the Linn Benton Housing Authority asserting that James was "disabled" due to her left ankle fracture and chronic pain, and needed a live-in aide. Tr. 168.

On January 24, 2006, orthopedic surgeon Scott McAtee, M.D., evaluated James at Dr. Athay's request. Tr. 193-94. Dr. McAtee observed that the brace stabilized her ankle from progressive swelling, but that her ankle would swell when it was removed. Tr. 193. X-rays revealed that the ankle fracture had healed completely, but that degenerative arthritis was developing at the ankle joint. *Id.* He believed that her options were limited to pain medication or arthrodesis of the joint. *Id.*

The following week, Dr. Athay prescribed Fentanyl for James' chronic pain. Tr. 192. Because this medication gave her headaches, she switched to OxyContin, supplemented with Lorcet. Tr. 191. In March, James reported that OxyContin was not strong enough, and Dr. Athay increased her dosage, hoping that she would decrease her use of the Lorcet. Tr. 190. The following month James reported that OxyContin, along with Lorcet, were helping her pain. Tr. 189. Through August she continued to report moderate pain and headaches, despite taking medication as prescribed. Tr. 204, 206-07.

On November 8, 2006, Dr. Athay wrote a letter to James' attorney, detailing the reasons why he believed that James was disabled. Tr. 213. These reasons included her "chronic migraine headache disorder, with chronic neck and back pain," severe ankle pain, and poor alignment post-fracture. *Id*. Dr. Athay noted that James wears an ankle brace at all times, walks with a cane, and must elevate her foot 15 to 20 minutes, several times a day. *Id.* These problems, along with her migraines, would "interrupt her ability to work every day." Tr. 214. He cautioned that if her ankle arthritis worsened, she might be a candidate for total ankle replacement surgery. Tr. 213.

On November 22, 2006, Dr. Athay reported that James was taking medication for her stress and depression, and that there was "no way that she could work eight hours a day five days a week with all of her medical problems." Tr. 225.

On June 27, 2007, after James was denied SSI, Dr. Athay wrote another letter detailing the reasons why he found James to be "100% disabled," including chronic left ankle pain, chronic headaches, chronic anxiety, mood disorder, and hypertension. Tr. 233. Further, Dr. Athay explained that the James' medications leave her unable to work. *Id.*

5 - FINDING AND RECOMMENDATION

## DISABILITY ANALYSIS

In construing an initial disability determination under Title XVI, the Commissioner engages in a five step sequential analysis. 20 CFR § 416.920; *Bowen v. Yuckert*, 482 US 137, 140 (1987).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, the claimant is not disabled. 20 CFR § 416.920(a)(4)(i).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement. 20 CFR §§ 416.909, 416.920(a)(4)(ii). Absent a severe impairment, the claimant is not disabled. *Id.*

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations. 20 CFR § 416.920(a)(4)(iii); 20 CFR Pt. 404, Subpt. P, App. 1 ("Listing of Impairments"). If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's RFC. The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments. 20 CFR § 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work. 20 CFR § 416.920(a)(4)(iv). If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national

economy.  *Yuckert*, 482 US at 142; *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999); 20 CFR § 416.920(a)(4)(v).

The initial burden of establishing disability rests upon the claimant.  *Tackett*, 180 F3d at 1098.  If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC.  *Id.*  If the Commissioner meets this burden, then the claimant is not disabled.  20 CFR § 416.966.

## **THE ALJ's FINDINGS**

At step one, the ALJ found James has not engaged in substantial gainful activity since August 8, 2004, the alleged onset date.  Tr. 17.

At step two, the ALJ determined that James suffers from the severe impairment of degenerative joint disease of the left ankle status post open reduction and internal fixation to treat a fractured ankle.  *Id.*  At step three, the ALJ concluded that James' impairment does not meet or equal any listed impairment.  Tr. 19.

The ALJ decided that James could perform a reduced range of light exertional work. Tr. 21.  She has the RFC to lift 20 pounds occasionally and 10 pounds frequently.  *Id.*  She can stand and walk for two hours in an eight-hour day and sit for about six hours in an eight-hour day.  *Id.*  James cannot use her left foot to operate controls and she cannot climb ropes, ladders, or scaffolds.  *Id.*  The climbing of ramps or stairs, crouching, crawling, and kneeling are all limited to an occasional basis.  *Id.*  The ALJ also determined that James' condition precludes her from even limited exposure to vibrations and heights.  *Id.*

At step four, the ALJ found that James cannot perform her past relevant work. Tr. 24. At step five, however, the ALJ concluded, based on the testimony of a vocational expert ("VE"), that James could perform the sedentary, unskilled jobs of final assembler, telephone quote clerk, and document sorter. Tr. 25.

## ALLEGATIONS OF ERROR

The Commissioner admits that the ALJ's decision is in error. Specifically, he concludes that the ALJ failed to develop an accurate RFC for James by neglecting to include her use of a medically prescribed cane in his assessment. Due to this omission, the hypothetical posed to the VE was incomplete, and the step five finding was in error. The Commissioner requests that this court reverse his decision and remand this case to the ALJ for further proceedings, specifically to re-evaluate James' RFC, including her ambulatory limitations and use of a cane, and to perform new step four and step five analyses.

James argues that the ALJ's analysis is replete with errors at multiple steps of the Commissioner's sequential analysis and not supported by substantial evidence. Specifically she asserts that the ALJ erred by: (1) rejecting her migraine headaches as a severe impairment and by failing to include them in his assessment of her RFC; (2) finding she did not meet Listing 1.03 in the Listing of Impairments; (3) rejecting her subjective pain testimony without adequate justification; (4) rejecting the opinion of her treating physician without adequate justification; and (5) finding that there are jobs she is capable of performing. In her view, the substantial evidence in the record compels a finding that she is disabled, and she asks this court to remand for the calculation and award of her SSI benefits.

## **STANDARD OF REVIEW**

Because the Commissioner agrees that the ALJ's decision contains legal error and is not supported by substantial evidence, the issue is whether to reverse and remand for further proceedings or for an award of benefits. This decision is within the court's discretion. *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir), *cert denied*, 531 US 1038 (2000).

A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings because the record has been fully developed and the evidence is not sufficient to support the Commissioner's decision, and it is clear from the record that the ALJ would be required to award benefits. *Benecke v. Barnhart*, 379 F3d 587, 593 (9th Cir 2004); *Holohan v. Massanari*, 246 F3d 1195, 1210 (9th Cir 2001); *Rodriguez v. Bowen*, 876 F2d 759, 763 (9th Cir 1989). Improperly rejected evidence should be credited as true and an immediate award of benefits directed where "(1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Harman*, 211 F3d at 1178, citing *Smolen v. Chater*, 80 F3d 1273, 1292 (9th Cir 1996). If it is not clear that the ALJ would be required to award benefits were the improperly rejected evidence credited, then the court has discretion whether to credit the evidence. *Connett v. Barnhart,* 340 F3d 871, 876 (9th Cir 2003).

///

///

## **FINDINGS**

### **I.    Improperly Rejected Evidence**

James' primary basis for claiming a permanent disability is the limitation her injured ankle imposes on her ability to function. While she asserts a number of other disabling limitations, they are secondary. While she claims, and her doctor supports, that she has suffered from chronic headaches and hypertension for many years, she did not seek disability benefits until after she broke her ankle in August 2004. On the basis of her ankle limitations alone, this case may be resolved in her favor. Thus, this court does not address James' other arguments.

James' treating physician, Dr. Athay, believes James is "100% disabled" and has provided several opinions outlining why. Tr. 213, 225, 233. On November 8, 2006, he wrote that "[James'] left ankle is always painful. The x-ray shows poor alignment post fracture and she has to wear brace [*sic*] on it all the time, and at times, she does have to elevate her foot because of the chronic pain. This is daily for 15 to 20 minutes several times a day." Tr. 213. The last sentence is key. At her hearing, James' attorney asked the VE what effect this requirement would have on her ability to work:

> Q  . . . And [Dr. Athay] said this [need to elevate her foot] is daily for 15 to 20 minutes several times a day, so I'll ask you to assume that that would be -- that that would - - the person would need to be permitted to do that outside of normal breaks. Could those jobs be performed if that was the length of time that there would be elevation?"
> A  No. That sounds like there would be daily unscheduled breaks, and that would just become excessive after a while in terms of lost productivity.

Tr. 268.

James testified to an even greater limitation, namely, that she has to lay down and elevate her foot at least four to five hours every day and can go no more than 30 minutes at a time without needing to elevate it.  Tr. 257-58.

The ALJ incorporated nothing about James' need to elevate her leg multiple times a day into the RFC he posed to the VE.  If he improperly rejected the testimony of James and Dr. Athay, then his RFC and step five finding are invalid.  *See Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 886 (9th Cir 2006) (finding ALJ's inadequate findings concerning a claimant's limitations caused his RFC to be "legally inadequate"); *Roberts v. Shalala*, 66 F3d 179, 187 (9th Cir 1995) (the ALJ can meet his burden at step five "by propounding to a vocational expert a hypothetical that reflects all the claimant's limitations."), *cert denied*, 517 US 1122 (1996)

### A.   James' Subjective Pain Testimony

#### 1.   Legal Standards

Once a claimant shows an underlying impairment which may "'reasonably be expected to produce the pain or other symptoms alleged,'" the ALJ must provide "clear and convincing" reasons for finding a claimant not credible.  *Lingenfelter v. Astrue*, 504 F3d 1028, 1036 (9th Cir 2007), quoting *Bunnell v. Sullivan*, 947 F2d 341, 344 (9th Cir 2007) and *Smolen*, 80 F3d at 1281.  The ALJ's credibility findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony."  *Orteza v. Shalala*, 50 F3d 748, 750 (9th Cir 1995), citing *Bunnell*, 947 F2d at 344.

The ALJ may consider objective medical evidence and the claimant's treatment history, as well as the claimant's daily activities, work record, and observations of physicians and third

11 - FINDINGS AND RECOMMENDATION

parties with personal knowledge of the claimant's functional limitations. *Smolen*, 80 F3d at 1284. The ALJ may also employ ordinary techniques of credibility evaluation, such as weighing inconsistent statements regarding symptoms. *Id*; *see also* SSR 96-7p, 1996 WL 374186 (July 2, 1996). Once a claimant shows an underlying impairment, the ALJ may not, however, make a negative credibility finding "solely because" the claimant's symptom testimony "is not substantiated affirmatively by objective medical evidence." *Robbins*, 466 F3d at 883 (citation omitted).

### 2. ALJ's Findings

The ALJ found that James' medically determinable impairment could reasonably be expected to produce some of her alleged symptoms, but that her "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible." Tr. 22. Specifically addressing her testimony about the limitations imposed by her ankle, the ALJ concluded that the overall evidence in the record indicated that James was "self-imposing these limitations and actually has substantially more capacity than she reports"; that the medical records showed "acute periods of illness have been of no more than a few months in duration"; and that "significant hospitalizations were infrequent, and her residual pain is reduced by use of medications." Tr. 23. Finally, he noted that "she stopped working to have her first child and has made no effort to work since that time in 1998." *Id*.

### 3. Analysis

The ALJ gave insufficient reasons for rejecting James' testimony. The ALJ did not cite any medical evidence to support his finding that James was self-limiting or had substantially more capacity than she was claiming. This conclusory rejection of James' testimony cannot be

countenanced.  *Holohan*, 246 F3d at 1208 ("[G]eneral findings are an insufficient basis to support an adverse credibility determination."), citing *Reddick v. Chater*, 157 F3d 715, 722 (9th Cir 1998).  In fact, there is no evidence (much less substantial evidence) to support the ALJ's opinion on this issue. The medical record shows that James experienced severe pain in her ankle which has an objective basis.  It further shows that James continuously sought and received treatment for her chronic ankle pain and has continuously received and used a cane, brace, and powerful pain medication to alleviate her pain.  While this court has not found any discussion in the contemporaneous medical records of her need to elevate her ankle, nothing inconsistent with her claim is recorded.  Also, nothing suggests she has a higher level of functionality than she claims or that she is practicing self-limiting behavior.  Mere disbelief of James' subjective pain testimony is not a legitimate basis for rejecting it in its entirety.  *See Benecke*, 379 F3d at 594 ("Sheer disbelief is no substitute for substantial evidence.").  To the extent the ALJ based his conclusions on the lack of corroborating evidence in the medical record as to the severity of James' pain, this also was error.  *See Smolen*, 80 F3d at 1284-85 (lack of corroborating statements of pain and fatigue in contemporaneous medical records not convincing reason for rejecting claimant's pain testimony where those records did not contradict claimant's testimony). Also, the ALJ does not explain how a failure to seek hospitalization bears any relevance to James' claim that she must elevate her foot.

The ALJ's other basis for finding James less than credible also is not convincing.  While he does not say so affirmatively, his reference to James' stopping work to have children is apparently offered as evidence that she is malingering or that her disability application is motivated by secondary gain.  James' treating physician opined that James is disabled not only

13 - FINDINGS AND RECOMMENDATION

due to her chronic left ankle pain, but also due to chronic headaches, chronic anxiety, and chronic mood disorder dating back to 1997.  Tr. 233.  Yet James did not file her application for SSI until after fracturing her ankle in 2004.  The fact that James filed her application approximately six years after leaving work to care for her children, and the fact that her application specifically mentions only her ankle fracture as the cause of her disability, weighs heavily against the ALJ's inference that James' application was motivated by secondary gain.  Rather, it supports the inference that she truly believed her ankle condition rendered her unable to return to gainful employment.  Finally, the requirement that James elevate her foot is supported by the opinion of her treating physician.  There is no basis for believing that she has improper motives in making this claim.

This court finds the ALJ's credibility determination to be in error.

### B.     Dr. Athay's Opinion

#### 1.     Legal Standards

An ALJ must ordinarily afford a treating physician's medical opinion substantial weight. Where his opinion is not contradicted by substantial evidence in the record and is supported by medically acceptable diagnostic techniques, it is given controlling weight.  20 CFR § 404.1527(d)(2); *Holohan*, 246 F3d at 1202.  To reject the uncontradicted opinion of a treating physician, the ALJ must give clear and convincing reasons supported by substantial evidence. *Reddick*, 157 F3d at 725.  Even when contradicted by another opinion, the ALJ must give a treating physician's opinion substantial weight and may not reject his opinion without giving legitimate and specific reasons supported by substantial evidence.  *Holohan*, 246 F3d at 1202.  A treating physician's opinion on the ultimate issue of disability, which is reserved to the

14 - FINDINGS AND RECOMMENDATION

Commissioner, is not controlling, but the rules for rejecting that opinion remain the same as those for medical opinions. *Id* at 1202-03.

### 2. <u>Analysis</u>

Although Dr. Athay's opinion encompassed much more, it is only necessary to resolve the ALJ's rejection of James' need to elevate her foot several times each day. The ALJ did not specifically address this issue and did not point to any medical evidence in the record that contradicted or cast doubt on this part of Dr. Athay's opinion. Rather, he gave two broadly worded reasons to reject all of Dr. Athay's conclusions.[1]

First, the ALJ noted that Dr. Athay did not provide a time frame for James' limitations. This is in apparent reference to the 12-month durational requirement for an impairment to qualify as a disability. 20 CFR § 416.909. Since the ALJ found at step two that the underlying condition of degenerative joint disease will last at least 12 months, this must be a reference to the specific requirement that James elevate her ankle several times a day. While Dr. Athay's letter does not state that James' need to elevate her ankle has lasted longer than 12-months, it is implicit. He comments that she has been experiencing pain in her ankle since her surgery in 2004 and must elevate her foot "because of the chronic pain." Tr. 213. The medical record shows that her pain had been more or less constant since the date of her injury. Nothing in the record indicates that the pain will cease in the future, and Dr. Athay's opinion that James has a "permanent disability" suggests the opposite. *Id*. It is not reasonable to infer that the duration

---

[1] The other reasons given by the ALJ support his rejection of Dr. Athay's general opinion that James is permanently disabled, and not any specific limitation her impairments impose. These other reasons include: (1) James' disability is an ultimate issue reserved to the Commissioner, and (2) Dr. Athay appeared to be basing his decision on non-medical considerations, such as James' status as a stay-at-home mother of three.

15 - FINDINGS AND RECOMMENDATION

of the ankle elevation requirement has been or would be less than 12 months when she had been experiencing chronic pain for over two years with no indication that it would resolve at any time in the future given her permanent disability.  This is not a convincing reason for rejecting his opinion.

The other reason the ALJ gave for rejecting Dr. Athay's opinion was his belief that Dr. Athay was "parroting" James' reporting for her attorney rather than drawing conclusions based on medical findings.  Tr. 23-24.  Once again, the ALJ points to no affirmative evidence that the doctor abandoned his role as a care provider and assumed the role of an advocate.  The ALJ "'may not assume that doctors routinely lie in order to help their patients collect disability benefits.'"  *Lester v. Chater*, 81 F3d 821, 832 (9th Cir 1995), quoting with approval, *Ratto v. Sec'y*, 839 F Supp 1415, 1426 (D Or 1993).  Furthermore, Dr. Athay does not "parrot" James' claims.  He states that she must elevate her leg at least 15-20 minutes several times a day, whereas James claims she must do so for four to five hours.  Throughout the record, Dr. Althay used his medical judgment for treating James' ankle by prescribing pain medication, a cane, and a brace.  Tr.  174, 189-92.  His medical judgment has been supported by objective evidence showing that James suffers from arthritis in her left ankle secondary to her ankle fracture and surgery.  Nothing indicates his statement about James' need to elevate her ankle several times a day is based on anything but the same medical judgment he used to address her ongoing chronic pain.

The ALJ gives no other reason for rejecting Dr. Athay's opinion that James must elevate her ankle several times a day.  Therefore, he erred by rejecting this portion of Dr. Athay's opinion.

16 - FINDINGS AND RECOMMENDATION

## II.     Utility of Further Proceedings

Because the ALJ's RFC determination failed to include the limitation that she be permitted to elevate her ankle for 15-20 minutes several times a day, it is invalid and cannot support the Commissioner's step five determination.  *See Robbins*, 466 F3d at 886.  The next steps in the remand analysis are to consider whether any outstanding issues must be resolved before a determination of disability can be made and whether it is clear from the record that the ALJ would be required to find James disabled.

Giving full credit to Dr. Athay's testimony, this court finds that further proceedings would serve no useful purpose.  Both James and Dr. Athay testified that James must elevate her ankle multiple time throughout the day.  The VE testified that this requirement, as set forth by Dr. Athay, would preclude the jobs he identified due to productivity issues.  It is reasonable to conclude that the productivity issues presented by this limitation would preclude all gainful employment not just the jobs the VE identified.   Due to this testimony by the VE, there is no need to remand this case for further proceedings.  Thus, this case should be remanded for the immediate award of benefits.  *See Benecke*, 379 F3d at 595 (concluding that because the record clearly established that the claimant "cannot perform a sedentary job or any other substantial gainful work that exists in the national economy, we need not return the case to the ALJ to make a residual functional capacity determination a second time."); *see also Rodriguez*, 876 F2d at 763 (crediting treating physician's uncontradicted testimony and awarding benefits).

## **RECOMMENDATION**

Because the ALJ improperly rejected evidence that compels a finding that James is disabled, the Commissioner's decision should be reversed, and this case should be remanded for an immediate calculation and award of benefits.

## SCHEDULING ORDER

Objections to the Findings and Recommendation, if any, are due June 8, 2009. If no objections are filed, then the Findings and Recommendation will be referred to a district judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district judge and go under advisement.

DATED this 21st day of May, 2009.

/s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge